Approved: _____
NICHOLAS CHIUCHIOLO
Assistant United States Attorney

Before: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

**18 MAG 1006**

- - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA            :     **SEALED COMPLAINT**
:
      - v. -                        :     Violations of
:     18 U.S.C. §§ 1343,
FELIX JACOB SALOMON GUILLEN,        :     1349, and 2
    a/k/a, "Jacob Salomon," and     :
GLADYS DIAMOND,                     :
:     COUNTY OF OFFENSE:
                  Defendants.       :     NEW YORK
:
:
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

CARMEN CACIOPPO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

**COUNT ONE**
(Wire Fraud Conspiracy)

1.  From at least in or about February 2014, up to and including in or about February 2018, in the Southern District of New York and elsewhere, FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," and GLADYS DIAMOND, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.  It was a part and object of the conspiracy that FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," and GLADYS DIAMOND, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and

1

promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 2.)

## COUNT TWO
(Wire Fraud)

3. From at least in or about February 2014, up to and including in or about February 2018, in the Southern District of New York and elsewhere, FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," and GLADYS DIAMOND, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SALOMON, DIAMOND, and others known and unknown, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, a New York City-based publishing company ("Publishing Company-1"), by causing a marketing company ("Vendor-1") under the control of SALOMON, DIAMOND, and others known and unknown, to submit false, fraudulent, and inflated invoices to Publishing Company-1 that did not reflect the work, if any, performed by Vendor-1 and, in furtherance of that scheme, caused bank wire transactions to be transmitted from New York, New York.

(Title 18, United States Code, Section 1343.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

4. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been personally involved in the investigation of this matter. I have been a Special Agent with the FBI since March 2016. I am assigned to a squad that investigates economic crimes. I am a certified public accountant licensed in the state of Pennsylvania.

2

5. This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## OVERVIEW OF THE SCHEME

6. The charges in this Complaint arise from a scheme by FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," and GLADYS DIAMOND, the defendants, and others known and unknown, to enrich themselves and their family members by fraudulently obtaining at least $1.88 million from Publishing Company-1. In particular, and as described in more detail below, I have learned that it was a part of the scheme that SALOMON and DIAMOND caused Vendor-1 to submit false, fraudulent, and inflated invoices to Publishing Company-1 that did not accurately reflect the work, if any, performed by Vendor-1 on behalf of Publishing Company-1. SALOMON, a Marketing Director at Publishing Company-1, used his position to seek out the purported services of Vendor-1 and to authorize payments from Publishing Company-1 to Vendor-1. These authorizations to pay the fraudulent invoices caused wire transfers of funds through the Southern District of New York. To enable the fraud scheme to continue, SALOMON concealed his financial interest in Vendor-1 and the fact that DIAMOND, Vendor-1's putative owner, was SALOMON's mother.

## RELEVANT INDIVIDUALS AND ENTITIES

### A. Publishing Company-1

7. Based on my participation in this investigation, including my review of publicly-available information and my participation in interviews, I have learned that Publishing Company-1 is a worldwide book publisher that is headquartered in New York, New York. Publishing Company-1 owned and operated various subsidiary companies, each specializing in publishing particular content, including a subsidiary company that focused on Christian publishing and a subsidiary company that focused on publishing Spanish-language books. As referred to herein,

3

"Publishing Company-1" includes its predecessors, successors, parent companies, and subsidiary companies.

### B.  Vendor-1

8.  Based on my participation in this investigation, including my review of publicly-available information, I have learned that Vendor-1, a purported online marketing company, is a limited liability company that was organized under the laws of Georgia in or about September 2013. Vendor-1's organizational documents identify GLADYS DIAMOND, the defendant, as its registered agent and corporate organizer. Based on my participation in witness interviews and my review of statements made by the defendants, I am aware that DIAMOND is the mother of FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," the defendant.

### C.  Vendor-2

9.  Based on my participation in this investigation, including my review of publicly-available information, I have learned that Vendor-2, another purported online marketing company, is a limited liability company that was organized under the laws of Georgia in or around January 2010. Vendor-2's organizational documents identify its organizers as FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," the defendant, and another individual ("CC-1"). Based on my participation in witness interviews and my review of statements made by the defendants, I am aware that SALOMON and CC-1 are married.

### THE FRAUDULENT SCHEME

10.  Based on my experience and my knowledge derived from this investigation, my review of publicly-available documents and documents maintained by Publishing Company-1, and my participation in various witness interviews, I have learned the following, among other things:

a.  In or around January 2013, Publishing Company-1 hired FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," the defendant, as a Director of Marketing. During his employment at Publishing Company-1, SALOMON worked in the Christian publishing and Spanish-language publishing divisions, among others. SALOMON's job description included, among other things, setting the strategy and overseeing execution of marketing plans and managing all proprietary digital marketing assets including social media and online platforms. For most of his employment

4

at Publishing Company-1, SALOMON worked in Publishing Company-1's offices located in Nashville, Tennessee.

b. At all relevant times to the facts alleged herein, the employment policies, practices, and processes governing SALOMON's employment at Publishing Company-1 prohibited employees, such as SALOMON, from engaging in certain types of self-dealing. For example, Publishing Company-1's May 2016 "Standards of Business Conduct," stated in relevant part:

i. "You must be alert to any actual or potential conflict of interest, or any situations that might be perceived to be a conflict and immediately disclose such conflicts to an appropriate representative in Human Resources or the Legal Department."

ii. "Keep in mind that you must not only refrain from improperly benefiting from your position or access, you must also guard against family or household members receiving improper advantages. You are responsible for making sure that those close to you do not inappropriately benefit from your position or access."

c. On at least an annual basis beginning in or around January 2013, up to and including May 2017, SALOMON executed an acknowledgement of Publishing Company-1's employment policies, practices, and processes.

d. From time-to-time, SALOMON used the services of outside vendors to perform marketing work on behalf of Publishing Company-1. SALOMON had signatory authority for vendor invoices up to $10,000.

e. In or around the end of 2014, SALOMON discussed with his then-supervisor ("Supervisor-1"), in substance and in part, the outsourcing of marketing work to an Atlanta-based marketing company, Vendor-1. Based on my conversations with Publishing Company-1 personnel, including Supervisor-1, and my review of documents maintained by Publishing Company-1, I have learned that SALOMON did not disclose to Publishing Company-1 that the putative owner of Vendor-1, DIAMOND, was SALOMON's mother, or that SALOMON had a pecuniary interest in Vendor-1.

f. Beginning in or around February 2014, up to and including in or around February 2018, Vendor-1 typically transmitted multiple invoices per month to Publishing Company-1

5

(the "Fraudulent Invoices"). These Fraudulent Invoices listed generic marketing services that Vendor-1 allegedly performed on behalf of Publishing Company-1, such as: "Online Audience Management"; "Online Advertisement Management"; "Content Marketing Campaigns"; "Ebook Promotions."

g. From approximately February 2014, up to and including February 2018, SALOMON and/or his subordinates, acting at SALOMON's direction and/or under his control, approved approximately more than 151 Fraudulent Invoices that Vendor-1 submitted to Publishing Company-1.

h. The amount listed on each Fraudulent Invoice ranged from approximately $5,000 to approximately $9,750, just under the maximum invoice amount that SALOMON was authorized to approve. While combined monthly invoices typically exceeded $10,000, no invoice on its own ever exceeded $10,000.

i. After approving each Fraudulent Invoice, SALOMON submitted the Fraudulent Invoice for payment to Publishing Company-1's accounts payable group located in Scranton, Pennsylvania. Prior to June 2016, SALOMON caused the Fraudulent Invoices to be mailed from Nashville, Tennessee to Scranton, Pennsylvania. Beginning in or about June 2016, SALOMON used Publishing Company-1's online accounts payable system to electronically transmit the Fraudulent invoices from Nashville, Tennessee to Scranton, Pennsylvania.

j. After invoices were processed by Publishing Company-1's accounts payable group, Publishing Company-1 wired funds from its bank accounts to Vendor-1's bank account. These funds were wired through bank accounts located in New York, New York.

k. Vendor-1's bank records, obtained pursuant to a subpoena, show that in calendar year 2017 alone, Vendor-1 received approximately $753,500 in payments from Publishing Company-1 (the "2017 Payments"). Based on my review of law enforcement analysis of these bank records from 2017, I am aware of the following, among other things:

i. Approximately $495,360 of the 2017 Payments were transferred from Vendor-1's bank account to accounts controlled by SALOMON;

6

    ii. Approximately $11,275 of the 2017 Payments were paid to Mercedes-Benz Financial Services;

    iii. Approximately $68,075 of the 2017 Payments were used to service credit card debt for, among other things: travel expenses for SALOMON; SALOMON's wife, CC-1; and members of CC-1's Christian-rock band;

    iv. Approximately $91,100 of the 2017 Payments were sent via wire transfer to a bank account in El Salvador held in the name of a particular individual, which I have learned is CC-1's father, *i.e.*, SALOMON's father-in-law.

  11. Based on my knowledge and experience derived from this investigation, my review of documents maintained by Publishing Company-1, and my participation in various witness interviews, I have learned the following, among other things:

    a. After a diligent search, Publishing Company-1 was unable to confirm the existence or receipt of work product created by Vendor-1 or Vendor-2.

    b. As part of this investigation, a subpoena was served on Vendor-1 seeking, among other things, "all documents and/or communications sufficient to show all work performed for [Publishing Company-1]." Vendor-1 produced no documents in response to this specific request.

  12. Based on my conversations with other law enforcement agents involved in this investigation, and my review of law enforcement reports, I am aware that GLADYS DIAMOND, the defendant, voluntarily agreed to speak with law enforcement agents on or about April 9, 2018, and stated, in substance and in part, that of the approximately $750,000 that Publishing Company-1 paid to Vendor-1 in 2017, DIAMOND received approximately $26,000 as profit and approximately $487,000 was paid to Vendor-2 for purported web-development services.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of FELIX JACOB SALOMON GUILLEN, a/k/a "Jacob Salomon," and GLADYS DIAMOND, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

_____
CARMEN CACIOPPO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
28th day of November, 2018

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

8